# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| PSC METALS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:17-cv-01088 |
| ) | Judge Aleta A. Trauger |
| SOUTHERN RECYCLING, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Pending before the court is a Motion for Summary Judgment (Docket No. 29), filed by the defendant, Southern Recycling, LLC ("Southern"), to which the plaintiff, PSC Metals, Inc. ("PSC"), has filed a Response in Opposition (Docket No. 73), and Southern has filed a Reply (Docket No. 82). For the reasons discussed herein, Southern's Motion for Summary Judgment will be denied.

## BACKGROUND[1]

PSC and Southern are scrap metal recycling companies with substantial operations in Nashville, Tennessee. On December 9, 2015, they entered into a Confidentiality and Non-Disclosure Agreement as part of discussions regarding PSC's potential purchase of Southern's Nashville assets and business operations. (Docket No. 9-1.) On January 20, 2017, the parties entered into a letter of intent ("LOI"). (Docket No. 9-2.) Although non-binding with regard to the terms and structure of the potential acquisition, the LOI included a binding exclusivity provision that granted PSC exclusive negotiating rights with Southern. The exclusivity provision states in relevant part:

---

[1] The facts are viewed in the light most favorable to Southern.

1

> The Company [Southern] and its member shall agree that for a period of thirty (30) days from the date they accept this letter (the "Initial Exclusivity Period"), **neither the Company nor its member will**, without the prior written consent of PSC, solicit or **engage in any discussions** or negotiations **regarding (a) the sale or transfer of all or substantially all or any material portion of the Nashville assets used in the Company's business** . . . .

(*Id*. at 4) (emphasis added). In addition to the initial thirty-day exclusivity period, the LOI provided for three additional, subsequent thirty-day periods, contingent upon certain conditions being met by the end of each. PSC met these conditions, and thus the total exclusivity period, as extended, ran through May 20, 2017. The non-binding terms of the LOI included a $28 million purchase price for PSC's acquisition of Southern's Nashville assets, and a corresponding $1 million purchase price for Southern's acquisition of PSC's Bowling Green assets, leaving a total sales price of $27 million.

On March 9, 2017, Southern's president, John Felloneau, received an inquiry regarding Southern's Nashville assets and business operations from an interested third party, Ferrous Processing and Trading ("FPT"). Like Southern and PSC, FPT is a scrap metal recycling company in the Nashville area. The inquiry came via telephone from William Sulak, FPT's Southeast Regional Director. Sulak and Fellonneau conducted business regularly, and the March 9 phone call was not the first time Sulak broached the possibility of FPT's buying Southern's Nashville assets. (Docket No. 75-3, p. 24) (Deposition of William Sulak) ("I probably first mentioned it, you know, maybe a year or so - - I'm sorry, maybe a couple of years ago. Maybe when we first started talking about, you know, just the regular transactional business."). Sulak's impetus for the March 9 phone call was an overheard conversation at an industry event in St. Louis, in which a PSC employee, Andre Pujadas, boasted that PSC was "going to take away all of [FPT's] business in the Nashville area and that [Pujadas] was going after Southern

2

Recycling." (*Id*. at 31.) That boast, combined with rumors Sulak had heard "in the trade," prompted Sulak on March 7, 2017, to consult FPT's president, Dave Dobronos, about reaching out to Southern. (*Id*.) Two days later, Sulak called Fellonneau and asked whether Southern was selling to PSC and, if so, whether FPT could potentially purchase Southern's Nashville assets. (*Id*. at 33.) Fellonneau denied that Southern was negotiating with PSC and told Sulak that, while Southern was not interested in selling, Sulak would be the first person he would call should that change. (*Id*.) Southern promptly brought the inquiries to PSC's attention, and negotiations continued pursuant to the terms of the LOI. On April 20, 2017, PSC provided a draft Asset Purchase Agreement ("APA") to Southern.

Sometime following the March 9 call, Sulak arranged a meeting for himself, Fellonneau, and Dobronos, to take place during an April industry convention in New Orleans. Dobronos and Fellonneau had never met, and Sulak has claimed that the purpose of the meeting was to introduce the pair, in order to facilitate future business between FPT and Southern. (*Id*. at 40.) Sulak also intended to use the meeting to advance discussions about an FPT acquisition of Southern's Nashville assets, but he did not communicate that intention to Fellonneau. (*Id*.) Fellonneau was twice asked in deposition about the meeting's purpose, first explaining:

> Q: Okay. And what was your understanding of the purpose of that meeting?
>
> A: He wanted to introduce me to the new president of Ferrous Processing and Trading.
>
> Q: Okay. Any other purpose?
>
> A: Not that was expressed to me at that time, no.

But later in the deposition, Fellonneau's account changed:

> Q: Did you know that Mr. Dobronos was going to be at the meeting?

A: No.

Q: When did you learn that Mr. Dobronos was at the meeting or going to be at the meeting?

A: When I walked into the meeting.

Q: Did you know him previously?

A: No.

Q: What did you think the purpose of the meeting was going to be?

A: The same purpose that all of us have meetings at the national convention.

Q: Which is what?

A: To discuss business in general, ongoing relationships, whatever issues may be between the parties.

(Docket No. 75-4, p. 13, 18-19.) On April 27, 2017, the men met in the cocktail lounge of an unidentified New Orleans restaurant (the "New Orleans meeting"). The lounge was crowded and casual, and the meeting was brief, lasting thirty minutes or less. Sulak introduced Dobronos and Fellonneau, and the three discussed market conditions and New Orleans as a convention venue. Dobronos then raised the possibility of Southern selling its Nashville assets to FPT. Fellonneau, when asked about this exchange, recalled his answer as follows:

Q: As best you can, tell me exactly what you said to Mr. Dobronos.

A: "The company is not for sale; however, if it were for sale, it would take a ridiculous number, probably in the $30 million range."

(*Id*. at 19–20.) Fellonneau was later asked again about the price he provided Dobronos and Sulak:

4

> Q: Did you identify a price for the sale of the company at the meeting?
>
> A: I indicated a number. And the way it was presented was the company was not for sale; however, if somebody is stupid enough to pay us $30 million, we would consider it.
>
> . . .
>
> Q: Where did that number come from?
>
> A: It was a number I pulled out of the air.
>
> Q: Had you thought about it beforehand?
>
> A: Nope.
>
> Q: Do any sort of analysis?
>
> A: Nope.

(*Id.* at 15, 17.) Fellonneau explained that he offered the $30 million number "[a]s a way to try and quell the rumors that kept swirling about the sale of the company." (*Id*. at 21.)

Fellonneau did not speak to Dobronos or Sulak again at the conference and did not communicate to Sulak that Southern had an exclusivity period with PSC expiring on May 20. (*Id*. at 40). Fellonneau's next contact with FPT was May 23—two business days after the expiration of the exclusivity period with PSC—when Sulak phoned Fellonneau to, again, express interest in Southern's Nashville assets. In his deposition, Sulak paraphrased his pitch as follows: "Hey, you know, if - - if we could, you know, pay $30 million for this yard, you know, in Nashville, is that - - you know, basically does - - let's maybe have some additional conversations to see if it makes sense to go further into the exploratory process." (Docket No. 75-3, p. 63.) Fellonneau stated in his deposition that he had no subsequent discussions with FPT regarding the $30 million sale price. (Docket No. 75-4, p. 46.)

Southern provided PSC with a response to its April 20 draft APA on May 10, 2017. PSC then requested an extension of the exclusivity period beyond May 20, 2017; Southern denied the request but continued to engage in negotiations with PSC. On June 9, 2017, Southern contacted FPT to discuss due diligence requirements. On June 28, 2017, Southern followed up with FPT, providing high level terms for a potential deal. On July 7, 2017, Southern suspended discussions with PSC via email. The email stated that Southern had "received an indication of interest in our Nashville assets from another party indicating a superior price as well as more favorable terms." (Docket No. 75-6.) Ultimately, no deal was reached with FPT, and Southern decided not to sell its Nashville assets.

On July 26, 2017, PSC filed suit, alleging breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. (Docket No. 1.) On August 17, 2017, before discovery had begun, Southern filed a Motion to Dismiss (Docket No. 29), which the court converted to a Motion for Summary Judgment (Docket No. 33). PSC successfully moved to take discovery—which the court limited at Southern's request—and on March 12, 2018, filed its Response in Opposition to Southern's Motion for Summary Judgment. (Docket No. 73.) On March 22, 2018, Southern filed its Reply. (Docket No. 82.)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment, if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City*

*of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## **ANALYSIS**

Under Tennessee law, interpretation of a written contract is generally a matter of law, not fact. *See Hamblen Cty. v. City of Morristown*, 656 S.W.2d 331, 336 (Tenn. 1983). The court's undertaking is to determine the intention of the parties at the time of execution. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). To do so, courts are bound by contract terms as written and should interpret terms in accordance with their "natural and ordinary meaning":

> In the absence of fraud or mistake, courts should construe contracts as written. The courts should accord contractual terms their natural and ordinary meaning, and should construe them in the context of the entire contract. The courts should also avoid strained constructions that create ambiguities where none exist.

*Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999) (internal citations omitted).

7

The exclusivity provision provides that Southern will not "solicit or engage in any discussions or negotiations regarding (a) the sale . . . of the Nashville assets [of Southern] . . . without the prior written consent of PSC." (Docket No. 9-2, p. 4.) Southern contends that it is entitled to summary judgment because Fellonneau's statements at the meeting were not a discussion or negotiation[2] about the potential sale of Southern's Nashville assets, and therefore no evidence supports a breach of the exclusivity provision. PSC contends that Southern is not entitled to summary judgment because Fellonneau breached the exclusivity provision by engaging in a discussion about the potential sale of Southern's Nashville assets at the New Orleans meeting. At the crux of the disagreement is what constitutes a discussion under the LOI. The LOI does not define the term. In its ordinary meaning, "discussion" is defined as "consideration or examination by argument, comment, etc., esp[ecially] to explore solutions;". *Discussion*, WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 1998). The Black's Law Dictionary definition is "[t]he act of exchanging views on something;". *Discussion*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Southern argues that the New Orleans meeting alone is insufficient to constitute a breach of the exclusivity provision. It argues that the price Fellonneau provided was hypothetical, off-the-cuff, and offered immediately following a reassurance that Southern was not for sale. Thus, Southern contends, the conversation cannot be deemed a discussion about a potential sale. But each of Southern's justifications is problematic.

---

[2] Southern cites dictionaries, case law, and an opinion from the Tennessee Attorney General to support the definition it sets forth for "negotiation." (Docket No. 82, p. 9–10.) Tellingly, it sets forth no definition for "discussion."

First, Southern claims the price was only hypothetical, but it was stated at a meeting between company presidents,[3] in response to the latest of FPT's years-spanning solicitations about the assets in question. Reading the exclusivity provision as allowing "hypothetical" discussions between high-level executives including key terms of a potential deal would render the provision meaningless. Second, Southern claims the price was off-the-cuff, but $30 million is not exactly pie in the sky; it is an approximately seven percent increase over the $28 million sales price in the PSC deal. Fellonneau called the $30 million number "ridiculous," (Docket No. 75-4 at 19–20), but the record indicates that FPT was prepared to proceed at exactly that price. (Docket No. 75-3 at 63) (Deposition of William Sulak) ("Hey, you know, if - - if we could, you know, pay $30 million for this yard, you know, in Nashville, is that - - you know, basically does - - let's maybe have some additional conversations to see if it makes sense to go further into the exploratory process."). And, when asked to recount his exact statement, Fellonneau recalled his phrasing as "probably in the $30 million range." To the extent that Fellonneau's price was off-the-cuff, it was a spontaneous ballpark estimate of a number that would incrementally increase Southern's return. Third, Southern claims that the price was a moot point because Fellonneau claimed that the company was not for sale. But, again, Fellonneau's recollections paint a different picture:

> Q: Did you identify a price for the sale of the company at the meeting?
>
> A: I indicated a number. **And the way it was presented was the company was not for sale; however, if somebody is stupid enough to pay us $30 million, we would consider it.**

---

[3] Fellonneau omitted Dobronos' presence when describing the meeting in his interrogatory responses.

9

(Docket No. 75-4 at 15) (emphasis added). By Fellonneau's own admission, the company was not for sale *unless someone would pay the price he was offering*. Following the disclaimer with a contradictory contingency effectively neuters the disclaimer.

The conversation at the end of the New Orleans meeting qualifies as a discussion by any reasonable construction of the word. There is uncontroverted evidence in the record that Dobronos and Fellonneau "considered . . . by . . . comment" the sale of Southern's Nashville assets. By naming the price at which Southern would potentially sell, Fellonneau "explored [the solution]" of selling. Dobronos and Fellonneau "exchange[d their] views" on a potential sale: Dobronos expressed interest in buying, and Fellonneau gave him a price. Southern's rejoinders that the price was hypothetical, off-the-cuff, and presented with a disclaimer are unavailing. The conversation was a discussion in the natural and ordinary meaning of the word.

Southern also argues that the meeting is not a "discussion" as the parties intended the term to be interpreted. Southern cites its dealings with PSC—specifically the parties' written agreements, due diligence efforts, and protracted conversations over several months—for the proposition that the New Orleans meeting does not meet "the plain definition of discussion or negotiation that the parties intended to be a violation of the Exclusivity Provision." (Docket No. 82, p. 10.) The court disagrees. The point of the exclusivity provision is not to prohibit only discussions with third parties that mirror Southern's discussions with PSC in scope and scale. The point of the exclusivity provision is to prevent Southern from engaging in any discussion— no matter how informal or cursory—that might influence Southern's participation in its negotiations with PSC. Floating a test balloon price point to the president of a third party *in response to a purchase inquiry* is exactly the type of exchange which, given any number of

10

reactions from Dobronos, could have led Fellonneau and Southern to drag their feet while waiting out expiration of the exclusivity provision.

Finally, Southern argues that Fellonneau could not engage in negotiations or sell the company without the Southern Board's authority or approval. But the exclusivity provision prohibits "the Company" and "any member" from "engag[ing] in any discussion" about a potential sale. (Docket No. 9-2, p. 4.) Surely, the President of the company falls within the parameters of this prohibition. Authority to complete a deal is not a condition of the provision. Fellonneau's inability to approve a sale is immaterial.

## CONCLUSION

Southern has certainly not established that it is entitled to summary judgment on the issue of whether it violated its obligations under the exclusivity provision. It seems clear to the court that it has and that there is no additional evidence that either party could produce on this issue. However, the court is loathe to *sua sponte* grant summary judgment to the non-moving party. Therefore, PSC's Motion for Leave to File Motion for Partial Summary Judgment (Docket No. 76) is **GRANTED**. The plaintiff PSC shall file its motion for partial summary judgment by April 13, 2018, the defendant shall respond by April 27, 2018, and PSC may file a reply by May 4, 2018.[4]

---

[4] The court urges the parties, in considering the resources being expended in this case, to focus on what damages, if any, PSC suffered as a result of what the court may well find a breach of the exclusivity provision by Southern. Perhaps time and resources would be better spent in an attempt to mediate and resolve their differences.

For the foregoing reasons, Southern's Motion for Summary Judgment is hereby **DENIED**.

It is so **ORDERED**.

ENTER this 29th day of March 2018.

_____
ALETA A. TRAUGER
United States District Judge