UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PSC METALS, INC., | ) | |
| | ) | |
| Plaintiff/Counter-defendant, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-01088 |
| | ) | Judge Aleta A. Trauger |
| SOUTHERN RECYCLING, LLC, | ) | |
| | ) | |
| Defendant/Counter-plaintiff. | ) | |

## MEMORANDUM

Pending before the court are two motions filed by the plaintiff/counter-defendant, PSC Metals, Inc. ("PSC"). The first is a Motion for Partial Summary Judgment (Docket No. 94), to which the defendant/counter-plaintiff, Southern Recycling, LLC ("Southern"), has filed a Response in Opposition (Docket No. 105), PSC has filed a Reply (Docket No. 111), Southern has filed a Sur-Reply (Docket No. 120), and PSC has filed a Sur-Response (Docket No. 123). The second is a Motion for Summary Judgment on Counterclaim (Docket No. 132), to which Southern has filed a Response (Docket No. 138). For the reasons discussed herein, PSC's motions will be granted.

## BACKGROUND[1]

PSC and Southern are scrap metal recycling companies with substantial operations in Nashville, Tennessee. On December 9, 2015, they entered into a Confidentiality and Non-Disclosure Agreement ("NDA") as part of discussions regarding PSC's potential purchase of Southern's Nashville assets and business operations. (Docket No. 9-1.) The agreement provided that the parties would not "disclose to any other person any of the terms, conditions or other facts

---

[1] The facts are viewed in the light most favorable to Southern.

1

with respect to any possible transaction . . . including the status thereof." (*Id*.) On January 20, 2017, the parties entered into a letter of intent ("LOI"). (Docket No. 9-2.) The LOI included a confidentiality provision stating that the parties "acknowledge that they have entered into a confidentiality agreement dated December 9, 2015 and that they continue to be bound by that agreement in accordance with its express terms." (*Id*. at 4–5.) Although non-binding with regard to the terms and structure of the potential acquisition, the LOI included a binding exclusivity provision that granted PSC exclusive negotiating rights with Southern. The exclusivity provision states in relevant part:

> The Company [Southern] and its member shall agree that for a period of thirty (30) days from the date they accept this letter (the "Initial Exclusivity Period"), **neither the Company nor its member will**, without the prior written consent of PSC, solicit or **engage in any discussions** or negotiations **regarding (a) the sale or transfer of all or substantially all or any material portion of the Nashville assets used in the Company's business** . . . .

(*Id*. at 4) (emphasis added). In addition to the initial thirty-day exclusivity period, the LOI provided for three additional, subsequent thirty-day periods, contingent upon certain conditions being met by the end of each. PSC met these conditions, and thus the total exclusivity period, as extended, ran through May 20, 2017. The non-binding terms of the LOI included a $28 million purchase price for PSC's acquisition of Southern's Nashville assets, and a corresponding $1 million purchase price for Southern's acquisition of PSC's Bowling Green assets, leaving a total sales price of $27 million.

On March 7, 2017, Southern's president, John Fellonneau, received an inquiry regarding Southern's Nashville assets and business operations from an interested third party, Ferrous Processing and Trading ("FPT"). Like Southern and PSC, FPT is a scrap metal recycling company in the Nashville area. The inquiry came via telephone from William Sulak, FPT's Southeast

Regional Director. Sulak and Fellonneau conducted business regularly, and the phone call was not the first time Sulak broached the possibility of FPT's buying Southern's Nashville assets. (Docket No. 75-3 at 24) (Deposition of William Sulak) ("I probably first mentioned it, you know, maybe a year or so - - I'm sorry, maybe a couple of years ago. Maybe when we first started talking about, you know, just the regular transactional business."). FPT's former Chairman and CEO, Howard Sherman had also previously expressed interest in purchasing Southern's Nashville assets. (Docket No. 106 at 1 (Second Declaration of John Fellonneau).) In 2015, Sherman "suggested that FPT would consider acquiring [the assets] for a price in the range of $11 million to $12 million." (*Id*.) Fellonneau told Sherman that the assets were not for sale, and Southern did not engage in negotiations with FPT in response to that proposal.

Sulak's impetus for the March 7, 2017 phone call was twofold. Word had gotten back to Sulak of an overheard conversation at an industry event in St. Louis, in which a PSC employee, Andre Pujadas, boasted that PSC was "going to take away all of [FPT's] business in the Nashville area and that [Pujadas] was going after Southern Recycling." (*Id*. at 31.) That boast, combined with rumors that PSC and Southern were negotiating—which Sulak had heard "in the trade" from a former PSC employee, David Reed—prompted Sulak to email FPT's president, Dave Dobronos, about reaching out to Southern. (*Id*.) In the email, Sulak indicated that his information was coming "from inside PSC." (Docket No. 82-2 at 5.) Later that day, Sulak called Fellonneau and asked whether Southern was selling to PSC and, if so, whether FPT could potentially purchase Southern's Nashville assets. (Docket No. 75-3 at 33.) Fellonneau denied that Southern was negotiating with PSC and told Sulak that, while Southern was not interested in selling, Sulak would be the first person he would call should that change. (*Id*.) Fellonneau investigated further and

"learned that the source of this information was PSC's Commercial Manager, Andre Pujadas." (Docket No. 24 at 1 (First Declaration of John Fellonneau).)

Southern promptly brought the inquiries and alleged leaks to PSC's attention. After the phone call from Sulak, Fellonneau emailed Ron Kline, Chief Executive Officer of PSC, to alert him of the rumors:

> I just finished a distressing phone call from Bill Sulak at Ferrous Processing & Trading. He asked me to confirm a rumor that he was told that Southern was negotiating the sale of its Tennessee and Kentucky assets to PSC Metals. I denied it and after asking him where he heard this, he told me from 2 separate highly placed sources at PSC. Please let me know what you may know about this.

(Docket No. 82-3 at 5.) Kline sent the following response that evening:

> I have been asked by FPT and others and appears they are all speculating. The fact he even mentions Kentucky confirms as much. I can assure you we have not shared this with anyone. I suspect Bill is fishing.

(*Id*. at 4.) The following day, Fellonneau forwarded Kline's response to Kevin Lewis, an employee of Southern's parent company who was actively involved in the negotiations between Southern and PSC. In the email to Lewis, Fellonneau rejected Kline's explanation and stated that he believed PSC was responsible for the leaks.

> I don't believe that Bill was fishing as Ron suggests. Bill and I have known each other and done deals together for years. He is a straight shooter. My guess is that it is Andre Pujadas, their commercial manager. He tends to drink heavily and blow off. Ed saw some of Andre's behavior in St. Louis where he was pretty well lit and telling anyone who would listed [sic] that PSC was going to take back all accounts they lost to Southern and FPT.

(*Id*.)

Despite Fellonneau's belief, negotiations between Southern and PSC continued pursuant to the terms of the LOI. On April 20, 2017, PSC provided a draft Asset Purchase Agreement ("APA") to Southern.

Sometime following the March 7 call, Sulak arranged a meeting for himself, Fellonneau, and Dobronos, to take place during an April industry convention in New Orleans. Dobronos and Fellonneau had never met, and Sulak has claimed that the purpose of the meeting was to introduce the pair, in order to facilitate future business between FPT and Southern. (*Id*. at 40.) Sulak also intended to use the meeting to advance discussions about an FPT acquisition of Southern's Nashville assets, but he did not communicate that intention to Fellonneau. (*Id*.) Fellonneau was twice asked in deposition about the meeting's purpose, first explaining:

> Q:    Okay. And what was your understanding of the purpose of
>        that meeting?
>
> A:    He wanted to introduce me to the new president of Ferrous
>        Processing and Trading.
>
> Q:    Okay. Any other purpose?
>
> A:    Not that was expressed to me at that time, no.

(Docket No. 75-4 at 13 (January 29, 2018 Deposition of John Fellonneau).) Later in the deposition, Fellonneau stated that he did not know that Dobronos would be present and thought that the meeting's purpose was of a more general nature:

> Q:    Did you know that Mr. Dobronos was going to be at the
>        meeting?
>
> A:    No.
>
> Q:    When did you learn that Mr. Dobronos was at the meeting or
>        going to be at the meeting?
>
> A:    When I walked into the meeting.

> Q:  Did you know him previously?
>
> A:  No.
>
> Q:  What did you think the purpose of the meeting was going to be?
>
> A:  The same purpose that all of us have meetings at the national convention.
>
> Q:  Which is what?
>
> A:  To discuss business in general, ongoing relationships, whatever issues may be between the parties.

(*Id*. at 18-19.)  On April 27, 2017, the men met in the cocktail lounge of an unidentified New Orleans restaurant (the "New Orleans meeting").  The lounge was crowded and casual, and the meeting was brief, lasting thirty minutes or less.  Sulak introduced Dobronos and Fellonneau, and the three discussed market conditions and New Orleans as a convention venue.  Dobronos then raised the possibility of Southern's selling its Nashville assets to FPT.  Fellonneau, when asked about this exchange, recalled his answer as follows:

> Q:  As best you can, tell me exactly what you said to Mr. Dobronos.
>
> A:  "The company is not for sale; however, if it were for sale, it would take a ridiculous number, probably in the $30 million range."

(*Id*. at 19–20.)  Fellonneau was later asked again about the price he provided Dobronos and Sulak:

> Q:  Did you identify a price for the sale of the company at the meeting?
>
> A:  I indicated a number.  And the way it was presented was the company was not for sale; however, if somebody is stupid enough to pay us $30 million, we would consider it.
>
> .   .   .
>
> Q:  Where did that number come from?

A:    It was a number I pulled out of the air.

Q:    Had you thought about it beforehand?

A:    Nope.

Q:    Do any sort of analysis?

A:    Nope.

(*Id.* at 15, 17.)  Fellonneau explained that he offered the $30 million number "[a]s a way to try and quell the rumors that kept swirling about the sale of the company."  (*Id*. at 21.)

Fellonneau did not speak to Dobronos or Sulak again at the conference and did not communicate to Sulak that Southern had an exclusivity period with PSC expiring on May 20.  (*Id.* at 40).  Fellonneau's next contact with FPT was May 23—two business days after the expiration of the exclusivity period with PSC—when Sulak phoned Fellonneau to, again, express interest in Southern's Nashville assets.  In his deposition, Sulak paraphrased his pitch as follows: "Hey, you know, if - - if we could, you know, pay $30 million for this yard, you know, in Nashville, is that - - you know, basically does - - let's maybe have some additional conversations to see if it makes sense to go further into the exploratory process."  (Docket No. 75-3 at 63.)  Fellonneau had no subsequent discussions with FPT regarding the $30 million sale price.  (Docket No. 75-4 at 46.)  On May 24, the day after his phone call with Sulak, Fellonneau notified Southern's Board of Managers "that another scrap operator in the Nashville area ha[d] contacted him to show interest in a purchase of the Nashville yard assets."  (Docket No. 82-3 at 9 (Minutes of Southern Board of Managers meeting).)  At that same meeting, Southern attorney Kevin Lewis updated the Board of Managers that PSC's exclusivity period had expired and that, while PSC had requested an extension, Southern had not yet granted one.  (*Id.*)

Southern had provided PSC with a response to its April 20 draft APA on May 10, 2017 and requested a draft from PSC of other deal-related documents. Following the May 24 Board of Managers meeting, Southern denied PSC's request for an extension of the exclusivity period. But Southern continued to engage in negotiations with PSC, including a face-to-face meeting on May 30, 2017, followed by other discussions. (Docket No. 29-1 (First Declaration of Kevin Lewis).) On June 9, 2017, Southern contacted FPT to discuss due diligence requirements for further discussion of the proposed asset purchase. On June 28, 2017, Southern followed up with FPT, providing high level terms for a potential deal. On July 7, 2017, Southern suspended discussions with PSC via email. The email stated that Southern had "received an indication of interest in our Nashville assets from another party indicating a superior price as well as more favorable terms." (Docket No. 75-6.) Ultimately, no deal was reached with FPT, and Southern decided not to sell its Nashville assets.

On July 26, 2017, PSC filed suit, alleging breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. (Docket No. 1.) On August 17, 2017, before discovery had begun, Southern filed a Motion to Dismiss (Docket No. 29), which the court converted to a Motion for Summary Judgment (Docket No. 33). PSC successfully moved to take discovery, which the court limited at Southern's request. On March 29, 2018, the court denied Southern's motion. (Docket No. 89.) On April 8, 2018, Southern filed its Answer and Counterclaim against PSC (Docket No. 91), alleging that PSC breached the NDA and LOI prior to Southern's alleged breach of the LOI. On April 13, 2018, PSC filed its Motion for Partial Summary Judgment, seeking judgment that Southern breached the LOI in the April 27, 2017 meeting with FPT.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment, if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## **ANALYSIS**

### A. **Whether Southern breached the LOI**

PSC argues that Fellonneau's April 27, 2017 conversation with Dobronos and Sulak violated the LOI's exclusivity provision. Southern offers several responses. First, it argues that the exclusivity provision is ambiguous, and its meaning is therefore a question of fact not appropriately determined by the court at the summary judgment stage. In "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based

upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co*., 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmer-Peoples Vank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). Ambiguity does not arise "merely because the parties may differ as to interpretations of certain of its provisions." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (citation omitted). Rather, "a 'contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Planters Gin*, 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973)).

Southern contends that the exclusivity provision, which mandated that Southern not "solicit or engage in any discussions or negotiations regarding (a) the sale" of the Nashville assets (Docket No. 9-2 at 4), was "intended to prohibit discussions between Southern and potential third-party bidders far more involved than a one-off question and answer." (Docket No. 105 at 12.) But Southern's proposed interpretation is relevant only if the exclusivity provision's language is ambiguous. The court finds that it is not. In deciding whether language is ambiguous, the court may consult dictionaries to determine plain meaning. *See Frank Rudy Heirs Assocs. v. Sholodge, Inc*., 967 S.W.2d 810, 816 (Tenn. Ct. App. 1997); Steven W. Feldman & James A. DeLanis, Resolving Contractual Ambiguity in Tennessee: A Systematic Approach, 68 Tenn. L. Rev. 73, 81 (2000). In their ordinary meanings, "discussion" is defined as "consideration . . . by . . . comment, etc., esp[ecially] to explore solutions" and "engage" is defined as to "involve oneself" or "to take part in." *Discussion* and *engage*, WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 1998). Similarly,

Black's Law Dictionary defines discussion as "[t]he act of exchanging views on something" and "engage" as to "occupy oneself" or "become involved." *Discussion* and *engage*, BLACK'S LAW DICTIONARY (10th ed. 2014). Had the parties wished to prohibit only advanced or complex negotiations, they could have drafted the exclusivity provision as such. But the court may not "speculate why the parties failed to include more [terms] than they did so long as the contract . . . is clear." *Volunteer Elec. Coop. v. TVA*, 139 F.Supp. 22, 27 (E.D. Tenn. 1954). To do so would threaten the "freedom of contract" that has historically "insured that parties to an agreement have the right and power to construct their own bargain." *Planters Gin*, 78 S.W.3d at 892. The usual, natural, and ordinary meaning of the exclusivity provision cannot be fairly understood in more than one way: it forbade Southern from becoming involved or taking part in *any* consideration by comment or exchange of views with a third party regarding the sale of its Nashville assets.

Southern relies heavily on an unreported First Circuit decision for the proposition that interpretation of the exclusivity provision is a factual inquiry that must be decided at trial. *See* (Docket No. 120 at 1 (citing *Prime Retail, L.P v. Caribbean Airport Facilities*, No. 97-2233, 1998 U.S. App. LEXIS 10639 (1st Cir. May 28, 1998)).) In *Prime Retail*, the First Circuit found that the language "engage in any discussions to sell" in an exclusivity provision lacked "fixed, well-established legal meanings that made [its] proper application in cases like the one before [the court] manifestly clear." *Prime Retail*, No. 97-2233, 1998 U.S. App. LEXIS at 12–13. Thus, the court held that, "because there are no controlling legal principles that govern the appropriate scope" of the provision, a factual determination was required to ascertain what the parties intended the provision to mean. *Id*. at 13. Neither unreported nor First Circuit decisions are binding on this court. As explained above, the ordinary meaning of the words "engage in any discussions" is manifestly clear to the court. Under Tennessee law, the provision's meaning is therefore not a

question of fact.  *Planters Gin*, 78 S.W.3d at 890 ("Only if ambiguity remains after the court applies the pertinent rules of construction does the legal meaning of the contract become a question of fact appropriate for a jury.").  Because the provision's language is unambiguous, whether Southern breached the provision is a matter of law properly decided on a motion for summary judgment.  *See id.* ("Finding no such ambiguity in the contract . . , the issues presented to this Court are suitable for determination by summary judgment.").

Southern argues that a reasonable jury could find that Fellonneau did not breach the exclusivity provision.  Southern first contends that, because the exclusivity provision prohibited "discussion**s**" in the plural tense, a jury could find the single exchange in the New Orleans bar insufficient to constitute a breach.  But the provision prohibits "**any** discussions," negating the possibility that only multiple discussions would constitute breach.  No reasonable jury could find that a provision barring "any discussions . . . regarding . . . sale" would allow a discussion regarding sale.

Southern's second and primary argument is that a reasonable jury could find that Fellonneau did not engage in any discussion regarding sale.  Southern explains that the New Orleans conversation took place against a backdrop of persistent interest from FPT regarding sale of the Nashville assets, all of which were rebuffed by Fellonneau.  It contends that, in offering a "ridiculous" price in response to yet another inquiry from FPT—an inquiry that Fellonneau rejected before naming the price—Fellonneau's intention was to "deter FPT's repeated inquiries and halt FPT's solicitations."  (Docket No. 105 at 13.)  In support, Southern points to FPT's 2015 offer, which was roughly a third of the $30 million price Fellonneau named in New Orleans.  This wide discrepancy, according to Southern, bolsters Fellonneau's claim that the $30 million number was one "pulled out of the air," without any forethought or analysis.  (Docket No. 75-4 at 17.)

Taking the facts in the light most favorable to Southern, Fellonneau was asked by a competitor with longstanding interest in Southern's Nashville assets whether they were for sale. Fellonneau wanted to head off the conversation and foreclose future inquiries. To those ends, he responded in the negative and added what he considered an unrealistic caveat: "The company is not for sale; however, if it were for sale, it would take a ridiculous number, probably in the $30 million range." (*Id*. at 19–20.) Southern contends that, under this reading of the facts, a reasonable jury could find that Fellonneau did not engage in a discussion regarding the sale of Southern's assets "but instead, was trying to avoid those discussions." (Docket No. 105 at 14.)

The court is not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)) (emphasis in original). Before leaving evidence to the jury, the court must ask "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id*. (emphasis in original). "In essence . . . the inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

There is insufficient evidence for a reasonable jury to find that Fellonneau did not engage in a discussion regarding the sale of the Nashville assets. Taking the facts in the light most favorable to Southern, Fellonneau tried to deter a purchase inquiry from FPT by naming a price he thought was so high that it would not be taken seriously. But Fellonneau's unilateral, hidden intentions are of no moment. Regardless of whether he meant to kill FPT's interest in the Nashville

assets, what he did, objectively, was respond to a purchase inquiry from a long-interested competitor with a price at which the assets could plausibly be purchased.  In other words, FPT asked if the assets were for sale and Fellonneau, of his own volition, responded that they were, in a manner that FPT took so seriously that it attempted to purchase the assets the following month for the exact price Fellonneau named.  (Docket No. 75-3 at 63.)  Fellonneau thereby became involved or took part in a consideration by comment or exchange of views regarding the sale of the Nashville assets.  No reasonable jury could find otherwise.

In its Response, Southern suggests the court's analysis would differ had Fellonneau used a different number.  *See* (Docket No. 105 at 14 ("What if Mr. Fellonneau tried to deter further inquiry by using a number fifteen percent over the LOI price?  Or twenty-five percent?  Or one hundred percent?  At what point does the number become so high so as to discourage FPT instead of 'to engage' it").)  These counterfactuals are not before the court.  The exorbitant point at which engagement ends and discouragement begins is certainly higher than an incremental increase over the LOI price that Fellonneau himself described as a "superior price" (Docket No. 75-6) and FPT found reasonable enough to use as a starting point for negotiation (Docket No. 75-3 at 63).  Had Fellonneau demanded $1 billion, it would have effectively communicated to FPT that the Nashville assets were not for sale.  Instead, Fellonneau's response put FPT on notice that the Nashville assets could legitimately be had.

That FPT's 2015 offer was significantly lower than $30 million does not lead to a different outcome.  FPT had repeatedly expressed interest in purchasing Southern's Nashville assets for years leading up to the New Orleans meeting, including the 2015 offer from Sherman (Docket 106 at 1), the first inquiry from Sulak   (Docket No. 75-3 at 24 ("I probably first mentioned it, you know, maybe a year or so - - I'm sorry, maybe a couple of years ago.  Maybe when we first started

talking about, you know, just the regular transactional business.")), and the March 7 phone call from Sulak (*id*. ("I did reach out to John and ask him if they had, you know, interest in selling the Nashville assets.")). The undisputed record shows that, when Fellonneau named his price at the New Orleans meeting, he knew he was talking to a persistent competitor who had continued trying to buy the Nashville assets even after their $11–$12 million offer was rejected. But whether Fellonneau thought FPT would pay a competitive price is not determinative; Fellonneau breached the exclusivity provision by naming a price that was objectively plausible, only $2 million more than that set out in the LOI. Indeed, the record shows that FPT was prepared to proceed at that exact price. *See* (Docket No. 75-3 at 63 ("Hey, you know, if - - if we could, you know, pay $30 million for this yard, you know, in Nashville, is that - - you know, basically does - - let's maybe have some additional conversations to see if it makes sense to go further into the exploratory process.").) By responding to a purchase inquiry with a price at which Southern's Nashville assets could conceivably be purchased, Fellonneau engaged in a discussion regarding the sale of the assets. No reasonable jury could find that Southern did not breach the LOI.

### B. Whether PSC breached the NDA and LOI prior to Southern's LOI breach

Because the court finds that Southern breached the LOI's exclusivity provision, both Southern's liability for its breach and PSC's liability under Southern's counterclaim turn on the same issue: whether PSC is guilty of a first breach. Southern's allegations of first breach stem from the alleged leaks by Andre Pujadas that, Southern contends, alerted FPT to Southern's negotiations with PSC. These leaks, according to Southern, constitute a first material breach of the LOI and NDA.

Under the "first-to-breach" rule, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract."

*White*, 395 S.W.3d at 715 (quoting *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199

(Tenn. Ct. App. 1990)); *see also Madden Phillips Constr. Co., Inc. v. GGAT Development Corp.*,

315 S.W.3d 800, 812 (Tenn. Ct. App. 2009) ("[A] party who commits the first uncured material

breach of contract may not recover damages for the other party's material breach.").  However, a

party owed performance may waive its right to assert the first uncured material breach as a bar to

recovery because of its own subsequent breach.  *White*, 395 S.W.3d at 715–16; *Madden*, 315

S.W.3d at 812.  In particular, a party may waive its right to assert first material breach as a bar to

recovery if it accepts the benefits of the contract with knowledge of a breach.  *White*, 395 S.W.3d

at 716 (quoting *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733–34 (Tenn. Ct. App. 1983));

*see also Madden*, 315 S.W.3d at 813; *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby

Cty. Airport Auth.*, 169 S.W.3d 627, 635–36 (Tenn. Ct. App. 2004) ("In general, by accepting

benefits under a contract with knowledge of a breach, the non-breaching party waives the

breach.").  Because waiver is an affirmative defense, a party asserting waiver of breach has the

burden to show waiver by a preponderance of the evidence.  *Madden*, 315 S.W.3d at 813.  "A party

must by express declaration; or by acts and declarations manifesting an intent and purpose not to

claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to

act, as to induce belief that it was the party's intention and purpose to waive."  *Id.* at 815 (internal

quotation marks and brackets omitted).

PSC argues that Southern waived any alleged breach committed by PSC because Southern

knew of the allegations against PSC but continued to perform under the LOI and NDA.[2]  Southern

counters that it cannot have intentionally waived any rights because it did not have knowledge of

PSC's alleged breaches.  Southern's position is that, because PSC denied the allegations when

---

[2] PSC denies that it committed a breach.

confronted by Southern, Southern only suspected—but did not know—that PSC had breached the LOI and NDA. Southern contends that it could not waive that of which it was not certain.

A party must have knowledge of a breach to waive its right to assert a first breach. *Madden*, 315 S.W.3d at 813. Tennessee precedent offers no further guidance as to the level of knowledge required for waiver of a first breach. However, the analogous doctrine of accrual is instructive. Under Tennessee law, a plaintiff is held to have a viable cause of action upon accrual. "Under the current discovery rule, a cause of action accrues . . . not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Smith v. Tennessee Nat'l Guard*, No. M201601109SCR11CV, 2018 WL 3083749, at *6 (Tenn. June 22, 2018). If Southern's cause of action for breach of the NDA and LOI accrued before Southern continued performance under them, it follows that Southern had sufficient knowledge to waive its right to assert a first breach.

Southern's counterclaim alleging a first breach by PSC is grounded in the following factual allegations:

> 19.     During an industry event in St. Louis, MO in February 2017, Andre Pujadas made statements to industry participants concerning PSC's interest in [Southern], either stating directly or indirectly that PSC was in discussions to acquire [Southern].

(Docket No. 91 at 14.)

> 23.     In addition to the comments of Andre Pujadas, which Mr. Sulak heard at the industry conference in St. Louis, Mr. Sulak also heard from David Reed, a former employee of PSC, that Southern and PSC were engaged in negotiations for the sale of [Southern]'s Nashville assets.
>
> 24.     Upon information and belief, David Reed was provided Confidential Information by Andrew [sic] Pujadas or another employee at PSC in violation of the NDA and LOI.

25.     In May 2017, Southern Recycling employee Rob Rutherford was contacted by Shawn Hatcher from the David Joseph Company indicating that he had heard from Mr. Pujadas that PSC was making a significant acquisition with the clear implication that he believed the PSC acquisition was Southern Recycling.

26.     In May 2017, Southern Recycling's shredder manager was contacted by a PSC employee who indicated that he had heard from a local Liebherr equipment dealer that services PSC's material handlers that PSC was buying Southern Recycling.   Southern Recycling does not do business with the local Liebherr equipment dealer cited as the source by the PSC employee.

(*Id.* at 14–15.)   Southern alleges that these leaks, primarily from Andre Pujadas, "created a significant distraction for Southern's business and its leadership . . , had an impact on other market participants' activities with [Southern] . . , [and] required Mr. Fellonneau and [Southern] to dispel rumors about the possible sale of the company on multiple occasions during the exclusivity period."   (*Id* at 17.)   The crux of Southern's claim for first breach is that "Mr. Fellonneau and Southern would not have needed to engage in conversations with competitors and others in the trade about the rumors regarding whether Southern was for sale if PSC had not previously breached the NDA and LOI."   (*Id.*)

Southern had knowledge in March of 2017 that leaks had allegedly come from Pujadas:

During the Exclusivity Period, my senior staff and I received unsolicited inquiries from an interested third-party in early March 2017.   These inquiries were prompted by information this third-party received from a high-ranking person at PSC that PSC was going to buy [Southern].   **Upon further inquiry into the matter, I learned that the source of this information was PSC's Commercial Manager Andre Pujadas**.   I immediately brought this matter to PSC's attention . . . .

(Docket No. 24-1 (First Declaration of John Fellonneau) (emphasis added).)   Indeed, Pujadas and Reed were the "2 separate highly placed sources at PSC" Fellonneau referenced in his March 7, 2017 email to Ron Kline at PSC.   (Docket No. 82-3 at 5.)   While PSC denied responsibility,

Fellonneau's email to Kevin Lewis the following day shows that Southern did not believe PSC's denials and continued to think that PSC was responsible for the leaks and corresponding rumors. *See* (*id.* at 4 ("I don't believe that Bill was fishing as Ron suggests. . . . My guess is that it is Andre Pujadas, their commercial manager.").) In its counterclaim against PSC for first breach, Southern does not cite any other evidence regarding PSC's leaks of February and March 2017. Southern does allege two new leaks of which it became aware in May 2017: one by Pujadas, and one by an unknown source at PSC who leaked to a local equipment dealer.[3]

On May 10, 2017—over two months after learning of Pujadas's first alleged leaks—Southern provided PSC with comments on its April 20 draft APA and requested a draft from PSC of other deal-related documents. The parties continued negotiations thereafter, including the May 30, 2017 face-to-face meeting and subsequent follow-up discussion. In Southern's own words, "[d]uring the period from January 20, 2017 to May 20, 2017, and for several weeks thereafter, Southern was engaged in ongoing discussions with PSC, was diligently pursuing a potential transaction with PSC and had not made any decision to end discussions with PSC regarding PSC's potential purchase of Southern's Nashville assets." (Docket No. 124-1 (Southern's Response to PSC's Amended Interrogatories).)

These facts are sufficient to constitute waiver under Tennessee law. Southern's cause of action for breach of the NDA and LOI accrued in March 2017. At that point, Southern was aware that Andre Pujadas "made statements to industry participants concerning PSC's interest in

---

[3] It is unclear from the record when these leaks occurred. Fellonneau learned of them via a May 17, 2017 email from Southern's General Manager, Rob Rutherford. (Docket No. 106-1.) The email does not specify an exact time frame. If the leaks occurred after April 27, 2017—when Southern breached the LOI at the New Orleans meeting—they cannot constitute breaches of the LOI. For the purposes of PSC's motions, the court assumes the leaks occurred before Southern's breach.

[Southern], either stating directly or indirectly that PSC was in discussions to acquire [Southern]." (Docket No. 91 at 14). This was corroborated to Fellonneau by someone who "saw some of Andre's behavior in St. Louis where he was pretty well lit and telling anyone who would listed [sic] that PSC was going to take back all accounts they lost to Southern and FPT." (Docket No. 82-3 at 4.) By its own admission, Southern suffered injury from those statements in March 2017, in the form of having to fend off allegedly unwanted inquiries from FPT. Despite PSC's blanket denial, Southern at that point had actual knowledge of the facts giving rise to its injury: it knew that Andre Pujadas was drunkenly boasting in St. Louis about PSC's interest in Southern, and it was receiving inquiries about whether Southern and PSC were in negotiations for Southern's Nashville assets from a third party whose source was Pujadas. After confronting PSC, Southern could have ceased negotiation with PSC, issued an ultimatum about future leaks, or filed suit against PSC for breach. Instead, it continued in its ordinary course of business dealings with PSC under the NDA and LOI for several months. *Cf. Madden*, 315 S.W.3d at 816 ("By allowing Madden Phillips to complete ninety percent of the project without further objection, GGAT waived its right to assert . . . first material breach of the parties' contract."). Fellonneau learned of new alleged leaks by PSC on May 17, 2017, but Southern again continued to conduct business as usual with PSC. *See* (Docket No. 29-1 ("Even though the Exclusivity Period expired on May 20, 2017, Southern continued to have discussions with PSC concerning a potential transaction, by participating in a face to face meeting on May 30, 2017, and by engaging in other discussions over the subsequent weeks.").) Southern's counterclaim alleges no new facts relevant to a first material breach by PSC that Southern did not know in May 2017. *Cf. White*, 395 S.W.3d at 717 ("[T]he defendant's failure to enforce the events of default on which they now rely constituted a waiver of

their right to assert . . . first material breach.").  Under Tennessee law, Southern waived its right to assert a first breach by PSC.

## CONCLUSION

For the foregoing reasons, PSC's Motion for Partial Summary Judgment (Docket No. 94) and Motion for Summary Judgment on Counterclaim (Docket No. 132) are hereby **GRANTED**.

A separate order will issue.

ENTER this 27th day of August 2018.

ALETA A. TRAUGER
United States District Judge